Case number 20-1330, NGL Supply Wholesale, LLC petitioner versus Federal Energy Regulatory Commission and United States of America. Mr. Dre for the petitioner, Ms. Becela for the respondent, Ms. Stekman for the interviewer. Good morning, counsel. Mr. Dre, please proceed when you're ready. Good morning and may it please the court, I'm Dominic Dre and I represent NGL, the petitioner in this case. I'd like to reserve two minutes for rebuttal. This case tests the limits of how a pipeline operator can use its affiliate to restrict access. The Phillips companies have devised three ways to discriminate against their competitor, NGL, and the commission offers only post hoc justifications for accepting these tactics. First, the affiliates pretend that the interconnection facilities that serve no purpose other than transportation are akin to storage facilities. Second, Phillips Pipeline's prorationing policy effectively ensures that only P66 will be a regular shipper and that is exactly what has happened. Third, P66 elevates form over substance to use a nominal exchange agreement to evade supervision of its affiliates' shipping transactions. The common thread in all of these is the strategic use of an affiliate to own an interconnection, to hold a monopoly and service gatekeeper over regular shipping, and to negotiate transportation apart from the pipeline. Why isn't the commission's reference to TEPCO, its precedent, a response to most of the arguments you're making now? Well, Your Honor, for a number of reasons. I actually quite love the TEPCO case because there the court explains, and I think this is particularly relevant for the interconnection, which is that last few feet of pipe between the Williams Terminal and the beginning of the Phillips Pipeline. There the court explains that anything that is necessary or integral to the transportation function falls within FERC's jurisdiction. And that, by the way, is a fairly consistent interpretation of the statutory language at Section 1.3 of the ICA, which lists a receipt of the property transported. But clearly the commission has drawn a distinction between transportation and what's going on at these supply facilities, has it not? Oh, yes, Your Honor. And so it's applied it in this circumstance and previously noted that fact that there's an affiliate relationship isn't dispositive. And furthermore, that your client made a business decision, and I really didn't see any answer to that. Okay, well, I think there are three points in Your Honor's question there that I'll sort of respond to rather quickly. The first is, yes, they do draw a distinction for terminaling facilities, but the conduct in this case, what we're talking about is pipe that serves no purpose other than transportation. So it's not like storage or odorization that were at issue in TEPCO. So if I hire a truck to bring propane to the transportation point, is that truck is part of jurisdictional transportation? No, no, Your Honor. Well, what's different here? Well, for starters, that's not a common carrier. And that gets to the alternatives argument that I think is so prevalent, but actually a complete red herring in this case, which is that FERC routinely points to it and less so FERC in its order, by the way, we should distinguish between these more FERC, you know, on appeal, and intervenors, of course, the Phillips companies to the existence of alternatives, but there are always alternatives. You could, but the commission in its order refers to that specifically. And I didn't see you respond in any way, or your client respond in any way in the sense of either saying, you know, those are financially prohibitive, alternative, or, you know, we don't have the necessary interconnection, or whatever. I just didn't see any response. Have I missed something? Judge, I do think that you have missed that, because... All right, where does your client say those are not alternatives available to it? So they point to the commercial practicability in a number of places. What does that mean, commercial practicability? So for example, and this is bleeding more into the prorationing discussion, the Phillips companies at page 12 of their brief say things, and they said this in their answer below as well. It's the same argument. All right. Now, I really want to know what your client said in response to FERC's reference to its view that this was a business determination by your client. Oh, okay. So first of all, Your Honor, what we point out is that that's irrelevant, that you do not have to work around and explore other options when it's a common carrier, because there are always other options. We could just hire a truck to drive the propane all the way across these three states if we were so inclined. The ICA exists to force common carriage. That's the whole point of the ICA. Where you have affiliate transactions, you could very easily interpose. And frankly, if FERC and the Phillips companies were correct in this case, I would advise every pipeline company I have to insert an affiliate for the last few feet of pipe, which no one argues accomplishes anything other than transportation, and extract rents above the FERC approved tariff. The ICA requires a common carrier to provide transportation service upon reasonable request. Let me ask you, counsel, and I may have missed this. I thought FERC's response was, was there any undue discrimination? And it said, well, you made a business judgment. In your terms, it wasn't commercially practicable. But it's not as though the blue line isn't open to all comers. And that P66 would accept propane delivered by these alternative means. I just didn't see that issue directly contested by you either before the commission or in your brief on appeal. So again, I think part of the reason for is that it's irrelevant whether or not there are other ways to work around. The question is whether the question is undue discrimination, isn't it? Yes, that's right. Exactly. And so you cannot take part of your transportation function, and opted out of the FERC tariff, and then and then demand a separate payment for that, or for that matter, assigned to a, an affiliate, a gateway function that makes them a monopolist on the east end of the pipeline to control access to whether or not anybody becomes a regular shipper. If, if we were to affirm FERC's decision that this is not jurisdictional, the end point there, does that take out all the other issues? Or do we still have to new user? Yes, bad news. The court will have to address all of all three of them. I don't think that they rise and fall on that single question, Your Honor. With that, I want to be mindful of time. So I'll reserve the balance here for rebuttal. Okay, thank you, Mr. Dre. Miss Pasella. Good morning, Your Honors. Can you hear me? Yes. Thank you. So I think I'll start off with the proprietary interconnection. The Commission's holding was that there are other ways to transport propane from the Williams Terminal to the Blue Line. So what that means, and what that means is that there are other ways to transport propane from Williams to the Blue Line. And therefore it's not for... Counsel, could you respond directly to what we just heard Petitioner's Counsel say in response to my questions? I'm not sure I fully understood what he was saying, Your Honor. I'm sorry. He said, first of all, there's no requirement where an affiliate is setting itself up basically as a monopolist for access, and that what FERC referred to as alternatives are commercially impracticable. So what the Commission's talking about regarding business decisions and alternatives is really, it's just alternatives from the exchange agreement, Your Honor. What the Commission is talking about there is if you look at business decisions, the Commission is talking about that it fails, NGL fails to achieve regular shipper status, that it results from its own business decisions not to obtain alternative supplies. And what it's talking about there is that they have never asked Phillips 66 to sell to them in the summer. This is a summer issue. At this point, where in the order are you talking about? So I'm talking about, it's not set out in the order. What the Commission says in the order is at JA8 paragraph 20, where the Commission makes the business decision point. But that's not the time on that. The Commission's fundamental holding is that nothing prevents a shipper that nominates volumes on the blue line at 12 consecutive months from becoming a regular shipper. And that's how the Commission reviews this, because what the Interstate Commerce Act requires is that common carriers provide service to shippers that request service. And so nominations are the issue. You have to already be nominating before a prorationing policy takes effect before the Commission would consider whether prorationing policy itself is unduly discriminatory. Does it make any difference that the way the pipeline is operated, it goes north for half of the year and south for the other half of the year? And let's just suppose here that what NGL wants is to go north all the time. It doesn't make any difference because the point of prorationing policies are to honor shipper loyalty. So a common carrier is required to take any reasonable request for service. And so what happens is sometimes there's just too much request for service. They can't take everybody. So prorationing policies are necessary and they're legitimate. And the historical prorationing, which is very common and long approved by the Commission, allows the pipeline to prefer to promote shipper loyalty so that they don't lose shippers who do ship on them, not just six months of the year, but 12 months of the year. And so that's what's occurring here. And here, NGL says that they can't ship during the summer because Phillips 66 won't sell to them. But the record not only doesn't support that, it refutes that. If you look at Phillips answer at JA 237, they explain NGL has not asked Phillips 66 to sell propane to it at Wood River, which is on the east end of the blue line in the summer. And then NGL answers that it stands by its assertion at JA 643. NGL stands by its assertion that it has requested to purchase propane supplied from Phillips 66 at Wood River to no avail. In support of that, they submit Exhibit B. And I can't talk about Exhibit B. I apologize. I did not intend to talk about a sealed document and I will not. I will just refer you to page 708. I won't tell you what it says, but I will mention that it is a winter date, not a summer date, these emails. So they submit two emails in support. Neither of these emails is dated in the summer. They're dated in the winter period. So there's no support for NGL's claim that Phillips 66 has refused to sell to them. And record shows definitively that there's never been a request for service in the summer and that Phillips 66 has said that they will sell to them. So the concern, so it really is a business decision of NGL not to ship in 12 months. They do have this alternative option of simply asking NGL, excuse me, Phillips 66 to sell to them. Can I ask you a question about the exchange agreement part of this, which I guess the commission addressed initially in its order, but it's the last issue raised in the briefing. So I take it that the way that this works conceptually is that the question is whether what's going on is just an exchange of product, which is non-jurisdictional, or whether there's also transportation along the pipeline, which would bring it within jurisdiction. That's at a high level of generality, effectively, the distinction. That's basically right, Your Honor. The question is whether the agreement provides just for an exchange of the product or whether it requires that the product be transported on the pipeline, that there be transportation on a pipeline. And the commission's finding here is that there's no requirement as Phillips 66 does not have to receive from NGL at Conway on the blue line to effectuate the exchange. The agreement provides, if you look at, the agreement provides, if you look at Phillips answer at 23 to 24, which is cited by the commission in the order at JA3 paragraph 11 and note seven, it provides that during the winter months, NGL shall tender propane to Phillips 66 at Conway, and Phillips 66 shall tender an equal volume of propane at NGL's terminals in Jefferson City and East St. Louis. So there's no requirement that it be moved on a pipeline. And the fact, and the record also shows, explains why there are these fees that some of the fees include pipeline transportation type rates. And the reason for that is because it's, as Phillips 66 explained, this is a typical way of doing things that commonly, that commonly, excuse me, there are fees included that are intended to equalize the value of the product at the to, to dispute any of that. It's just that the commission's order doesn't talk about that. So what the commission does is it cites to Phillips answer at 23, which is JA253. And JA253, and that's only a little bit of the paragraph that addresses this is on JA253, it follows on to JA254. And in the, on JA253 to 254 is the entire answer. Phillips 66 explains that it can sell the propane NGL tenders at Conway to a third party at Conway, it can have the propane NGL tenders transported to a destination other than NGL terminals. It explains that then Phillips 66 can and does meet its obligation to tender propane to NGL terminals by sourcing propane from other origin points on the blue line or from other supply sources. And it further explains that this enables Phillips 66 to tender the volumes to NGL terminals as soon as NGL tenders its volumes at Conway. And that's what you're relying on in terms of the commission's order is it footnotes six and seven? I'm relying on, I'm relying on JA3 paragraph 11 and note seven. Note seven, okay. Which is citing Phillips answer at 23, which is really also 24, but this is that same paragraph. So the commission incorporated that answer into its order. And, and, and, and let's remember what this court's case law says is you just have to be able to discern the commission's path. Commission does not have to say every single thing in its order. If it cites to something that can be okay too. Okay. Let me make sure my colleagues don't have additional questions for you, Ms. Fussell. Thank you. We'll hear from intervenors council, Ms. Stechmann. Thank you, your honor. Good morning. I'm Britt Stechmann on behalf of the intervenors may it please the court. I'll address the interconnection mechanism if that would be helpful or I'm happy to address any of the other issues as well. Just to shed a little more color on this interconnection that P66 had constructed in 2018 at its own cost. So that interconnection is a direct connection, as you know, between the Williams terminal at Conway, Kansas and the blue line. And for many years prior to the construction of that, of that interconnection, shippers used a couple of other methods to get their product out of that large Williams storage facility and onto the blue line. They could do that either by going through the one Oak terminal or another interstate pipeline, which is called the central line. And both of those have direct connections to the blue line. And that worked fine. That worked fine for many years, but it did raise a logistical difficulty that was specific to P66, the shipper. And that's because P66 ships both propane as well as butane on the blue line. Butane is actually critical to the operations of P66's refineries, which sit on either end of the blue line. And P66 needs to have the ability to move that butane out of storage to its refineries whenever it needs to do so. And it needs to ensure that the butane would not be contaminated either by being mixed with propane or with lower quality butane. And so it would require just a lot of coordination on P66's part whenever they needed to get that product out of storage. And that's why in 2018, P66 chose to contract with Williams to have Williams, the storage provider, construct a line, that line that directly connects the deliverability and quality for P66, which again is the shipper, not the pipeline operator. P66 later chose to expand the scope of that interconnection that it was already constructing to include propane movements as well. And again, this is all just for P66's operational purposes related to its movements of both propane and butane. So if P66 were to require another shipper, NGL, to use that line, it would essentially defeat the purposes for which P66 made that investment, which was to be able to to quickly and reliably move whatever product it needed out of storage. Well, counsel, I didn't understand that to be the nature of the answer. I thought the nature of the answer was, well, NGL never asked us. The implication is that if it had, it wouldn't have said no, just arbitrarily, but rather it would have said either no, because we don't have any space available for the time slot you want, or something like that, given a rational answer. Well, your honor, there are two different issues here. The issue for which P66 said you never asked us, that's actually the issue of purchases from the Wood River refinery. That's refinery that sits at the east end of the pipeline, and the interconnection is in Conway, Kansas. So NGL has raised these three separate issues on appeal, and the interconnection is issue one, and then the issue of whether P66 would sell to it at the Wood River refinery, I think that's issue number two or three. So issue number one at Conway, there's no space available? Well, essentially, P66 needs to have its proprietary interconnection available for its own use, so that it can choose which products it's moving in and out of the pipeline. So is that a yes to my question? I apologize, your honor. I apologize. Could you could you repeat it? I'm sorry. My question was, I thought the answer was, they never asked us, and you said, no, no, that's as to the Wood. As to the Conway, P66 needs it for its own products. So no space for anybody else? Correct, your honor. All right, so the answer is yes. Yes, ma'am. Let me make sure there's no additional questions from my colleagues for you, Ms. Deckman. Thank you. Thank you. Mr. Dre, we'll give you your two minutes for rebuttal. Okay, so good morning. A couple of responses there. First of all, I appreciate my friends on the other side clarifying the Conway versus East End distinction and the issue there. The Reese affidavit, which is under seal, but at pages 173 through 176, discusses at length how we've tried to ship on the West End at the Conway. And as the court will see, NGL could fill the entire blue line and has proposed to do that over the course of several years. So the issue of not being a regular shipper is biting NGL on the West End because we can only ship 5% as a new shipper. So these are actually quite interconnected. To return to the prorationing topic briefly, the commission sort of relies on this idea, and it puts blinders on itself in violation of Michigan versus EPA to say that if we say that something is based on who nominates, that we won't consider anything else, the practical possibility of nomination. And there's a fact issue around whether or not Phillips had in fact refused, and I suppose it would be P-66 to keep my entity straight, whether P-66 had refused to sell on the East End of the blue line. The record citation at 643 is dated in a winter month, but it is an attempt to purchase for the summer months, which is how one negotiates these kinds of transactions. The complaint, this is at JA-17, asserts that P-66 refused. And there was never an Well, I guess there are two vexing features about this litigation. One is the lack of explanation and evidentiary hearing below. And the other pervasive issue is the affiliate nature of this transaction. And this court just over the summer in Environmental Defense Fund versus FERC explained that it would A, not consider the so-called business decision justification that's at page 33 of the EDF opinion from this past June, which postdates the party's briefing in this case. And that it would look with higher scrutiny. That's a quote the court would view with higher scrutiny affiliate transactions because there's no arm's length negotiation. And so in this case, you have an affiliate controlling who becomes a regular shipper and look at page 12 again of the Phillips Company's brief where they give themselves a generous carve out for when they're willing to Williams Terminal on the other side. Last point, FERC does exert jurisdiction over the interconnection with the One Oak Terminal on the West End. And there's no rational explanation for why they don't exercise jurisdiction over this interconnection, which is exclusively transferred in your brief. I beg your pardon? Did you make that comparison in your brief between? Yes, sir. You do? Okay. Yes, sir. I don't have a page number for you. But that's okay. I don't have it in front of me anyways. Thank you. Okay, my colleagues, I know further questions for you. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Rogers, Sentelle